UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HARRY MARKARIAN | ) | Civil No. 1:20-cv-02445 |
| 16 Windemere Drive | ) | |
| Lumberton, NJ 08048 | ) | |
| Derivatively on Behalf of DANAHER | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS P. JOYCE JR. | ) | |
| 3325 Prospect Street NW | ) | |
| Washington, DC 20007, | ) | |
| | ) | |
| WALTER G. LOHR JR. | ) | |
| 444 Hendricks Isle, Apt. 502 | ) | |
| Fort Lauderdale, FL 33301, | ) | |
| | ) | |
| JOHN T. SCHWIETERS | ) | |
| 965 Melvin Road | ) | |
| Annapolis, MD 21403, | ) | |
| | ) | |
| LINDA HEFFNER FILLER | ) | |
| 2311 Burr Oak Road | ) | |
| Northfield, IL 60093, | ) | |
| | ) | |
| ALAN G. SPOON | ) | |
| 11 Ledgeways | ) | |
| Wellesley Hills, MA 02481, | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | __DEMAND FOR JURY TRIAL__ |
| [Caption continued on following page.] | ) | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT AND VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

TERI LIST-STOLL                              )
5692 Pines Ridge Court                       )
Petoskey, MI 49770,                          )
                                             )
STEVEN M. RALES                              )
1402 31st Street NW                          )
Washington, DC 20007,                        )
                                             )
MITCHELL P. RALES                            )
11760 Glen Road                              )
Rockville, MD 20854,                         )
                                             )
RAYMOND C. STEVENS                           )
254 North Barrington Avenue                  )
Los Angeles, CA 90049,                       )
                                             )
        – and –                              )
                                             )
ELIAS A. ZERHOUNI                            )
2748 NE 17th Street                          )
Fort Lauderdale, FL 33305,                   )
                                             )
                        Defendants,          )
                                             )
        – and –                              )
                                             )
DANAHER CORPORATION                          )
2200 Pennsylvania Avenue, NW, Suite 800W     )
Washington, DC 20037,                        )
a Delaware corporation,                      )
                                             )
                Nominal Defendant.           )
                                             )
_____      )

# TABLE OF CONTENTS

I.      OVERVIEW ..................................................................................................................1

II.     INTRODUCTION .........................................................................................................2

III.    JURISDICTION AND VENUE ....................................................................................9

IV.     PARTIES ....................................................................................................................10

        A.      Plaintiff ...........................................................................................................10

        B.      Nominal Defendant..........................................................................................10

        C.      Director Defendants ........................................................................................10

        D.      Non-Defendant Directors ................................................................................13

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ..............14

VI.     DEFENDANTS' DUTY TO ACT IN THE BEST INTERESTS OF DANAHER
        AND ITS SHAREHOLDERS .....................................................................................14

VII.    ENHANCING SHAREHOLDER WEALTH IS A DIRECTOR'S
        FUNDAMENTAL DUTY ...........................................................................................15

        A.      Racial and Ethnic Diversity Serves the Best Interests of Shareholders
                Because It Maximizes Shareholder Wealth .......................................................17

VIII.   MILLIONS IN POTENTIAL EXCESS SHAREHOLDER WEALTH
        SQUANDERED ..........................................................................................................20

        A.      The Danaher Board of Directors.......................................................................20

        B.      Defendants' False and Misleading Statements About Diversity at Danaher .........20

                1.      False and Misleading Statements Concerning Danaher's
                        Commitment to Diversity on the Company's Website and in Its
                        Annual Reports .....................................................................................21

                2.      False and Misleading Statements Concerning Diversity in the
                        Company's Corporate Social Responsibility Reports ...............................22

                3.      False and Misleading Statements Concerning Danaher's
                        Commitment to Diversity in the Company's Proxy Statements ................24

                4.      The Statements About Danaher's Racial and Ethnic Diversity Were
                        Knowingly False ...................................................................................26

C.      The Nominating and Governance Committee's Role in the Perpetuation of Danaher's Non-Racially Diverse Board ................................................................26

D.      Danaher's Majority Voting Rule, as Applied, Discourages the Nomination of Ethnic Minorities and African Americans to the Board ...................................27

E.      The Absence of Term Limits Discourages the Nomination of African American Men or Women to the Board................................................................28

F.      Defendants Have Enriched Themselves at the Expense of Danaher's Shareholders by Making Misleading Statements About Danaher's Commitment to Diversity ........................................................................................29

IX.      MINORITY MAJORITY DEMOGRAPHIC SHIFTS AND EMERGING TECHNOLOGIES URGENTLY CALL FOR AFRICAN AMERICANS ON CORPORATE BOARDS OF DIRECTORS .....................................................................30

X.      DERIVATIVE ALLEGATIONS................................................................................35

XI.      COUNT I ....................................................................................................................41

XII.      COUNT II ...................................................................................................................42

XIII.      COUNT III .................................................................................................................43

XIV.      PRAYER FOR RELIEF .............................................................................................44

XV.      JURY DEMAND ........................................................................................................46

## I.   OVERVIEW

1.     This is shareholder derivative action on behalf of nominal defendant Danaher Corporation ("Danaher" or the "Company") against its Board of Directors and Chief Executive Officer for breach of fiduciary duty, unjust enrichment and violation of the federal securities laws. Specifically, the defendants are Thomas P. Joyce Jr. ("Joyce"), Walter G. Lohr Jr. ("Lohr"), John T. Schwieters ("Schwieters"), Linda Heffner Filler ("Filler"), Alan G. Spoon ("Spoon"), Teri List-Stoll ("List-Stoll"), Steven M. Rales ("S. Rales"), Mitchell P. Rales ("M. Rales"), Raymond C. Stevens ("Stevens"), and Elias A. Zerhouni ("Zerhouni") (together, "Defendants").

2.     Based in Washington D.C., Danaher designs, manufactures and markets professional, medical, industrial and commercial products and services, with research and development, manufacturing, sales and distribution in 60 countries.  Danaher's business is conducted in three operating segments: Life Sciences; Diagnostics; and Environmental & Applied Solutions.

3.     The Company's most recent Form 10-K filed with the SEC adds that Danaher is committed "to innovating and developing forward-looking technologies that solve our customers' most complex challenges."  Danaher Corporation, Annual Report (Form 10-K) (Feb. 21, 2020) at 1.  However, nominating or appointing an African American director is a challenge that has conspicuously eluded the Company's leadership.

4.     For the past several years, Defendants have publicly represented Danaher as a company that effectively promotes diversity throughout its ranks.  But, in 2020, there are still no African American directors on Danaher's Board.  Although each of the Defendants was aware of this fact, Defendants repeatedly represented, among other things, that Danaher "***strongly believe[s] that the best team is a diverse team that reflects the global community [it] serves***."  *See* Danaher Corporation, 2019 Sustainability Report ("2019 SR Report") at 4.

5.      The business case for diversity has never been stronger – which Defendants acknowledge.   In 2015, McKinsey & Company ("McKinsey") first reported a statistically significant relationship between a more diverse leadership team and better financial performance, finding that "[c]ompanies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median," while "[c]ompanies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging)."  Vivian Hunt, Dennis Layton, & Sara Prince, *Diversity Matters*, McKinsey & Company, at 1 (Feb. 2, 2015) ("*Diversity Matters*"), https://www.mckinsey.com/~/media/ mckinsey/business%20functions/organization/our%20insights/why%20diversity%20matters/dive rsity%20matters.pdf.

6.      Danaher has been damaged and continues to be irreparably harmed by Defendants' conscious, continuing failure to actually do what they repeatedly told shareholders they would do – embrace racial diversity throughout every level of Danaher's organization.  Accordingly, City of Pontiac General Employees' Retirement System ("City of Pontiac") seeks to remedy Defendants' dereliction of their legal duty to act in the best interests of Danaher and remove the institutional barriers preventing the Company from reaching its stated diversity objectives.

## II.      INTRODUCTION

7.      Danaher acknowledges that diversity "*is vital for our sustained success*" and has consistently and publicly expressed its commitment to diversity at every level of the Company. Danaher Corporation, 2018 Annual Report to Shareholders ("2018 Annual Report"), Letter to Shareholders.  Yet Danaher has failed to nominate or appoint even a single African American person to a directorship at the Company.  Rather than address these deficiencies head-on – by nominating one or more African Americans to the Board – Defendants have caused the Company

to issue platitudes.  In its publicly facing communications, Danaher has repeatedly claimed that diversity is among the Company's top priorities and that the Company has implemented a myriad of initiatives, policies, and practices designed to accelerate diversity:

- "*A diverse and inclusive workforce strengthens Danaher and ensures the best team continues to win*."  Danaher Corporation, 2018 Sustainability Report ("2018 SR Report") at 19.

- "Our efforts around *diversity and inclusion are among the important drivers* of associate engagement, *and we have made good progress on these fronts* . . . ." Danaher Corporation, 2019 Annual Report to Shareholders ("2019 Annual Report"), Letter to Shareholders.

- "*We build the best team by developing leaders at all levels of our organization,* recognizing outstanding performance and shaping our culture to meet our stakeholders' needs."  Danaher Corporation, 2016-17 Corporate Social Responsibility Report ("2016-17 CSR Report") at 10.

- "We seek out a wide range of unique experiences, perspectives and talents, ensuring that diverse voices and viewpoints are heard and celebrated."  *Id.*

- "[W]e are honored to have been named to *Forbes*' list of Best Employers for Women (2019) and *Best Employers for Diversity* (2018 & 2019)."  2019 Annual Report, Letter to Shareholders.

- "*Reflecting our continued commitment to diversity and inclusion*, we've trained more than 3,000 managers globally on how to build inclusive and *diverse teams and leaders* . . . ."  Danaher Corporation, Proxy Statement (Sch. 14A) (Mar. 27, 2019) ("2019 Proxy Statement") at 13.

- "*We strongly believe that the best team is a diverse team that reflects the global community we serve*."  2019 SR Report at 4.

8.      Corporate platitudes do not equate to diversity on a company's board.  Indeed, Danaher remains among a number of large publicly traded companies in the United States without an African American man or woman on its Board.  The following are the current members of the Board:

Thomas P. Joyce, Jr.


Mitchell P. Rales


Raymond C. Stevens


Linda Hefner Filler


Steven M. Rales


Elias A. Zerhouni


Teri List-Stoll


John T. Schwieters


Jessica L. Mega


Walter G. Lohr, Jr.


Alan G. Spoon


Pardis C. Sabeti


9.      Indeed, Danaher has been exposed more than once for being among the 20 largest companies in the United States without a single African American on its Board.  *See Here Are the Largest Companies in America with Zero Black People on Their Boards*, Black Enterprise (Sept. 8, 2017), https://www.blackenterprise.com/companies-without-black-directors.  ***That was three years ago***.  That exposure did not result in any changes to the Board makeup, at least not with respect to the addition of any African Americans.  More recently, the Company has been exposed yet again.  *See* Kerri Anne Renzulli, *The 20 Largest Public U.S. Companies Without a Black Person On Their Board*, Newsweek (June 17, 2020), https://www.newsweek.com/20-largest-public-us-companies-without-black-person-their-board-1511319.[1]  A dearth of qualified African

---

[1] *See also* Sara Ashley O'Brien, *He's served on 14 boards. Now he wants companies to find other Black candidates*, CNN Business (July 24, 2020), https://www.cnn.com/2020/07/24/tech/barry-lawson-williams-black-board-representation/ index.html.

American candidates is not the reason for Defendants' failure to live up to the Company's professed commitment.  Instead, its efforts to build an ethnically diverse and inclusive team at all levels of the Company have intentionally stopped short of the Board.  *See* Danaher Corporation, Proxy Statement (Sch. 14A) (Mar. 25, 2020) ("2020 Proxy Statement") at 5 ("The Board does not have a formal or informal policy with respect to diversity . . . .").

10.     In May 2020, a McKinsey report concluded that "[t]he business case for inclusion and diversity (I&D) is stronger than ever," finding that "companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019."  Vivian Hunt, Sara Prince, Sundiatu Dixon-Fyle, & Kevin Dolan, *Diversity wins:  How inclusion Matters*, McKinsey & Company, at 3-4 (May 19, 2020) ("*Diversity wins*"), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.   McKinsey also found that, "[f]or diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity."  *Id*. at 3.

11.     Danaher's Board members have certain legal obligations and responsibilities to the Company and its shareholders – including the fiduciary duty to be truthful and honest and to act consistent with the Company's public representations about Danaher's policies and procedures. Defendants have fallen short on both counts.

12.     Instead of actually embracing diversity, Defendants have instead misled Danaher's shareholders and the public by making false and misleading assertions about the Company's commitment to diversity and have acted inconsistent with their obligation to act in the best interests of Danaher and its shareholders, which research confirms is attained through diverse leadership teams.  In doing so, Defendants have breached the fiduciary duties owed to Danaher and its shareholders.

13.     One irrefutable truth is that actions speak louder than words, and Defendants' failure to act consistent with the Company's representations concerning its commitment to diversity has adversely impacted the Company.  Danaher has suffered and will continue to suffer damage and reputational harm due to Defendants' failure to act, specifically their failure to nominate a single African American person to the Company's Board despite up to 56 opportunities to do so in the last five years.  Indeed, certain of Danaher's key competitors have in fact nominated and elected African American directors to their respective boards, including Corning, Inc. and Thermo Fisher Scientific.  *Board of Directors*, Corning, https://investor.corning.com/investor-relations/governance/board-of-directors/default.aspx (last visited Aug. 26, 2020) ("*Corning Board of Directors*"); *Board of Directors*, Thermo Fisher Scientific, https://ir.thermofisher.com/investors/corporate-governance/board-of-directors/default.aspx  (last  visited  Aug.  26,  2020) ("*Thermo Fisher Board of Directors*").  For these reasons, among others, pre-suit demand is excused in this case.  Accordingly, City of Pontiac brings this action to remedy Defendants' dereliction of their legal duty to act in the best interests of Danaher by, among other things, removing the institutional structures preventing Danaher from achieving its stated diversity objectives.

14.     Discussion of race and racism remains challenging, and sometimes difficult to address directly, even in 2020.  And directors of public companies are not immune from these difficulties, particularly where, as here, it is their public statements about diversity, and personal efforts to achieve diverse leadership, that have provoked the inquiry into the falsity of their publicly stated diversity objectives.

15.     The challenges are, perhaps, even more difficult in a corporate boardroom among colleagues of professional distinction.  In this context, asking a director implicated in alleged false

statements about his or her effort to create a diverse board and give fair consideration to potential African American director nominees or candidates puts the director at an intersection of cultural, ethical, legal, moral, sociological, and/or reputational dilemmas.  None reconcilable without potential great risks to the director, measured not just in money, but in social and reputational capital as well.

16.     A person of reasonable capacity and skill is not disinterested or otherwise detached from the outcome of such an inquiry.  The stakes are too high; and the risk of "cancellation" of a director for actual or perceived hostility towards African Americans is all too real.[2]  A decision to proceed with a pre-suit demand commences a potentially stigmatizing inquiry into a director, one that could expose the misleading nature of the director's publicly stated diversity objectives or question the director's fair consideration of potential African American director candidates.  On the other hand, a decision to reject a pre-suit demand could result in equally dire consequences for a director.  The public could view the director's previous statements supporting diversity as disingenuous and, therefore, false.  Or worse yet, a director could be perceived by the public as hostile to diversity and the efforts to truly encourage and build diverse leadership across the organization that includes African Americans.

---

[2] *See, e.g.*, Jemima McEvoy, *Every CEO And Leader That Stepped Down Since Black Lives Matter Protests Began*, Forbes (July 1, 2020), https://www.forbes.com/sites/jemimamcevoy/2020/07/01/every-ceo-and-leader-that-stepped-down-since-black-lives-matter-protests-began/#52e880555593; Andrew J. Hawkins, *Uber senior executive resigns after racial discrimination allegations*, The Verge (July 11, 2018), https://www.theverge.com/2018/7/11/17561336/uber-senior-executive-resigns-racial-discrimination-allegations; Sarah Whitten & Yen Nee Lee, *Papa John's founder John Schnatter resigns as chairman after apologizing for N-word comment, shares surge*, CNBC (July 12, 2018), https://www.cnbc.com/2018/07/10/papa-johns-founder-john-schnatter-resigns-as-chairman-of-company-boar.html; Rachel Ranosa, *CEO fired over alleged racism against Uber driver*, Human Resources Director (Feb. 11, 2020), https://www.hcamag.com/us/news/general/ceo-fired-over-alleged-racism-against-uber-driver/213275.

17.     This is, in part, precisely why a pre-suit demand is excused on the facts of this case. Here, the complaint details how, despite Defendants' purported efforts to create diversity at every level of the organization, no African American has been nominated to, let alone seated on, the Board since at least 2015.  Confronted with these facts, which call into question the veracity of the Defendants' publicly stated diversity objectives, there is ample reason to doubt whether Defendants, who are people of ordinary capacity and skill, can evaluate a pre-suit demand with the requisite disinterestedness, impartiality or objectivity required by law.

18.     A pre-suit demand is also excused because Defendants voluntarily chose to make false positive statements about diversity and their own efforts to achieve diversity at all levels, while concurrently declining to nominate an African American person to the Board at some point during the last five years.  Instead, on each occasion (56 times in total) they declined to do so. Defendants' actions, over an extended period of time, belie their public statements.  A failure to act with candor is a breach of a Delaware directors' fiduciary duty to act in the best interests of the corporation and its shareholders.  As such, Defendants face a substantial likelihood of liability for disloyalty, which renders a pre-suit demand excused as futile.

## III.     JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)).  This Court has exclusive subject matter jurisdiction over the federal securities law claims under §27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

20.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual

who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Danaher maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## IV.    PARTIES

### A.    Plaintiff

22.     Plaintiff Harry Markarian is and continuously has been a shareholder of Danaher since January 2018.

### B.    Nominal Defendant

23.     Nominal defendant Danaher is a Delaware corporation with its principal executive offices located at 2200 Pennsylvania Avenue, NW, Suite 800W, Washington, D.C. 20037.

### C.    Director Defendants

24.     Defendant Thomas P. Joyce Jr. has served as a director of Danaher since 2014.  He also has served on the Finance, Executive, and Science and Technology Committees of the Danaher Board.  Joyce publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization, when, in fact, it does not.  In 2019, Joyce received at least $18.1 million in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

25.     Defendant Walter G. Lohr Jr. has served as a director of Danaher since 1983. He also has served on the Audit, Compensation, Finance, and Nominating and Governance Committees of the Danaher Board. Lohr publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not. In 2019, Lohr received at least $317, 078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

26.     Defendant John T. Schwieters has served as a director of Danaher since 2003. He also has served on the Audit and Nominating and Governance Committees of the Danaher Board. Schwieters publicly misrepresented Danaher as a company that effectively promotes diversity throughout at all levels of the organization when, in fact, it does not. In 2019, Schwieters received at least $344,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

27.     Defendant Linda Heffner Filler has served as a director of Danaher since 2005. She also has served on the Nominating and Governance and Science and Technology Committees of the Danaher Board. Filler publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not. In 2019, Filler received at least $335,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

28.     Defendant Alan G. Spoon has served as a director of Danaher since 1999. He has also served on the Compensation Committee. Spoon publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not. In 2019, Spoon received at least $299,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

29.     Defendant Teri List-Stoll has served as a director of Danaher since 2011.  She also has served on the Audit and Compensation Committees of the Danaher Board.  List-Stoll publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not.  In 2019, List-Stoll received at least $299,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

30.     Defendant Steven M. Rales has served as a director of Danaher since 1983.  He also has served on the Finance, Executive, and Science and Technology Committees of the Danaher Board.  S. Rales publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not.

31.     Defendant Mitchell P. Rales has served as a director of Danaher since 1983.  He also has served on the Executive and Finance Committees of the Danaher Board.  M. Rales publicly misrepresented Danaher as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not.[3]

32.     Defendant Raymond C. Stevens has served as a director of Danaher since 2017.  He also has served on the Science and Technology Committee of the Danaher Board.  Stevens publicly misrepresented Danaher's as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not.  In 2019, Stevens received at least $299,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

33.     Defendant Elias A. Zerhouni has served as a director of Danaher since 2009.  He also has served on the Science and Technology and Nominating and Governance Committees of

---

[3] Defendants Steven and Mitchell Rales each received salaries of $419,000 in 2019 for their service as executive officers of the Company, but do not receive cash or equity incentive awards.  2020 Proxy Statement at 17.  They both receive various other benefits (entertainment, private plane, car, etc.) at the Company's cost.  *Id.*

the Danaher Board.  Zerhouni publicly misrepresented Danaher's as a company that effectively promotes diversity at all levels of the organization when, in fact, it does not.  In 2019, Zerhouni received at least $335,078 in fees and other compensation while failing to act in the best interests of Danaher and its shareholders.

### D.    Non-Defendant Directors

34.    Dr. Jessica L. Mega has served as a director of Danaher since 2019.  In 2019 Ms. Mega served on the Science and Technology Committee and received at least $105,006 in fees and other compensation in connection with her service on the Board.

35.    Dr. Pardis C. Sabeti has served as a director of Danaher since 2019. In 2019 Ms. Pardis served on the Science and Technology Committee and received at least $105,006 in fees and other compensation in connection with her service on the Board.

36.    By reason of their positions as Danaher's directors and/or officers and because of their ability to direct and control the Company's business and corporate affairs, Defendants owed Danaher and its shareholders a fiduciary duty to use their utmost ability to control and manage Danaher in an honest and lawful manner.  Toward that end, Danaher's directors and officers owed the Company and its shareholders fiduciary duties to exercise candor, loyalty, good faith, and reasonable supervision over the Company's management, policies, practices, and internal controls. Moreover, Defendants' fiduciary duties required them to, among other things: (i) ensure that Danaher complied with its legal obligations and requirements, including legal compliance with the corporations and federal securities laws, as well as acting only within the scope of legal authority and disseminating truthful and accurate statements to Danaher shareholders; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to lawfully maximize the value of the Company's shares; (iii) ensure that Danaher was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations, including the corporations and

securities laws; and (iv) refrain from breaching their fiduciary duties to Danaher by adopting initiatives, policies, practices, procedures, and controls inconsistent with their fiduciary duties of care, candor, loyalty, and good faith.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts complained of herein, Defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in the breach of their fiduciary duties.

38.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.   DEFENDANTS' DUTY TO ACT IN THE BEST INTERESTS OF DANAHER AND ITS SHAREHOLDERS

39.    Publicly traded corporations are one of country's most important institutions. Without profitable corporations, economies contract, communities fail, and the general welfare suffers.  Diversity in the boardroom and throughout a corporate enterprise is a bulwark against these ills.

40.    Research now shows that firms with greater diversity enjoy greater profitability and create more shareholder wealth.  As such, building a high functioning, diverse board of directors lies within the very heart of a director's fiduciary duty to maximize corporate value to the fullest extent.  Declining to do so is not protected by the business judgment rule.

- 14 -

### VII.   Enhancing Shareholder Wealth Is a Director's Fundamental Duty

41.     In early 2016, *The Economist* called shareholder primacy theory "the biggest idea in business," stating "today shareholder value rules business."  *Shareholder Value, Analyze this*, The Economist (Apr. 2, 2016).  T idea is not new, however.  It has been recognized for more than a century that "[a] business corporation is . . . carried on primarily for the profit of the stockholders."  *Dodge v. Ford Motor Co.*, 170 N.W. 668, 684 (Mich. 1919).  Over the years, this shareholder wealth maximization norm has become the most fundamental concept in corporate law and is firmly embedded in "the law of the most important American jurisdiction – Delaware."  Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporate Law*, Univ. of Penn., Inst. for Law & Econ., Research Paper No. 15-08, at 3 (Mar. 11, 2015) ("Strine, *Dangers of Denial*").

42.     As legendary Chicago school economist Milton Freedman succinctly put it, "corporations have no higher purpose than maximizing profits for their shareholders."  Milton Friedman, *Capitalism and Freedom* (1962).  More specifically, he stated:

> In a free-enterprise, private-property system, a corporate executive is an employee of the owners of the business.  He has direct responsibility to his employers.  That responsibility is to conduct the business in accordance with their desires, which generally will be to make as much money as possible while conforming to their basic rules of the society, both those embodied in law and those embodied in ethical custom.

Milton Friedman, *The Social Responsibility of Business is to Increase its Profits*, N.Y. Times Mag. at 1 (Sept. 13, 1970).

43.     Delaware corporate law has firmly embraced shareholder primacy.  As former Delaware Supreme Court Chief Justice Leo E. Strine, Jr. wrote:

> [A] clear-eyed look at the law of corporations in Delaware reveals that, within the limits of their discretion, directors must make stockholder welfare their sole end,

and that other interests may be taken into consideration only as a means of promoting stockholder welfare.

Strine, *Dangers of Denial* at 10. Thus, the directors of a Delaware corporation owe a fiduciary duty to make their decisions looking solely to the best interests of the Company and its shareholders. Hence, the fundamental interest that directors must serve is enhancing and protecting wealth for shareholders.

44. Delaware court decisions have strengthened the legal force behind the shareholder primacy theory. For example, in *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013), the Delaware Chancery Court held that "the standard of fiduciary conduct calls for the board to maximize the value of the corporation for the benefit of the common stock." *Id.* at 42 n.16. Likewise, in *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1 (Del. Ch. 2010), the Delaware Court of Chancery held:

> The corporate form . . . is not an appropriate vehicle for purely philanthropic ends, at least not when there are other stockholders interested in realizing a return on their investment. . . . The "Inc." after the company name has to mean at least that. Thus, I cannot accept as valid . . . a corporate policy that specifically, clearly, and admittedly seeks *not* to maximize the economic value of a for-profit Delaware corporation for the benefit of its stockholders . . . .

*Id.* at 34 (emphasis in original). Further, the Delaware Chancery Court in *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL, 2017 WL 1437308 (Del. Ch. Apr. 24, 2017), held that "the fiduciary relationship requires that the directors act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the providers of presumptively permanent equity capital." *Id.* at *18.

45. The central tenet of shareholder primacy is therefore to ensure that corporate Delaware directors act in the best interests of the corporation and its shareholders. A director who deviates from this maxim is committing a breach of fiduciary duty for which he may be held liable.

Of course, it is true that the business judgment rule provides directors with wide discretion, and that it enables directors to justify by reference to long run stockholder interests a number of decisions that may in fact be motivated more by a concern for a charity the CEO cares about, or the community in which the corporate headquarters is located, or once in a while, even the company's ordinary workers, than long run stockholder wealth.  But that does not alter the reality of what the law is.  *Dodge v. Ford* and *eBay* are hornbook law because they make clear that if a fiduciary admits that he is treating an interest other than stockholder wealth as an end in itself, rather than an instrument to stockholder wealth, he is committing a breach of fiduciary duty.

Strine, *Dangers of Denial* at 20.

### A.    Racial and Ethnic Diversity Serves the Best Interests of Shareholders Because It Maximizes Shareholder Wealth

46.    In 2015, McKinsey, one of the world's largest and most prestigious management consulting firms, first observed a statistically significant connection between diverse leadership and financial performance, finding that "[c]ompanies in the top quartile for racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median." *Diversity Matters* at 1.  After examining proprietary datasets for 366 public companies, including financial results and the composition of top management and boards, McKinsey found that "diversity correlates with better financial performance," while the "reverse is also true, companies in the bottom quartile in both gender and ethnicity underperformed the other three quartiles." *Id.* at 3.

47.    Moreover, the 2015 McKinsey report found that companies in the top quartile for gender or racial and ethnic diversity are more likely to have financial returns above their national industry median, while companies in the bottom quartile in these dimensions are statistically less likely to achieve above-average returns:

The analysis found a statistically significant relationship between a more diverse leadership team and better financial performance.  The companies in the top quartile of gender diversity were 15 percent more likely to have financial returns that were above their national industry median.  Companies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above

their national industry median.  Companies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging).   The results varied by country and industry. Companies with 10 percent higher gender and ethnic/racial diversity on management teams and boards in the US, for instance, had EBIT that was 1.1 percent higher; in the UK, companies with the same diversity level had EBIT that was 5.8 percent higher.  Moreover, the unequal performance across companies in the same industry and same country implies that diversity is a competitive differentiator that shifts market share towards more diverse companies.

*Id*. at 1.

48.     In 2018, McKinsey updated its research and again found that more diverse firms enjoy greater shareholder returns than less diverse firms, finding that ethnically diverse companies are 35% more likely to financially outperform ethnically homogeneous ones.  Vivian Hunt, Sara Prince, Sundiatu Dixon-Fyle, & Lareina Yee, *Delivering through Diversity*, McKinsey & Company,    at    8    (Jan.    2018)    ("*Delivering    through    Diversity*"), http://www.insurance.ca.gov/diversity/41-ISDGBD/GBDExternal/upload/McKinseyDeliverDiv 201801-2.pdf.  As McKinsey explained:

We first established a positive, statistically significant correlation between executive team diversity and financial performance in our 2015 *Why Diversity Matters* report (using 2014 diversity data).  We find this relationship persists in our expanded, updated, and global 2017 data set.  In *Why Diversity Matters* we found that companies in the top quartile for gender diversity on their executive teams were 15% more likely to experience above-average profitability than companies in the 4th quartile.  Almost exactly three years later, this number rose to 21% and continued to be statistically significant.  For ethnic/cultural diversity, the 2014 finding was a 35% likelihood of outperformance, comparable to the 2017 finding of a 33% likelihood of outperformance on EBIT margin, both statistically significant . . . .

*Id*. (footnotes omitted).

49.     Addressing boardroom diversity in particular, the 2018 *Delivering through Diversity* report found that "[e]thnic and cultural diversity's correlation with outperformance on profitability was also statistically significant at Board level," making companies with greater

ethnic and cultural board diversity 43% more likely to enjoy higher profits.  *Id*. at 13.  In other words, diversity provides increased shareholder returns, which is in the best interests of the corporation and its shareholders.  As McKinsey further explained:

> We found that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits.  We also found a positive correlation between ethnic/cultural diversity and value creation at both the executive team and Board levels, though the relationship is not statistically significant.  It may be the case that overall, the picture on top-team diversity globally is more complex due to significant geographic differences in the cultural contexts in which the companies we studied operate.
>
> Overall, our findings that ethnic and cultural diversity on executive teams continues to correlate strongly with company financial performance support the argument that there is value in promoting ethnic/cultural diversity in company top teams around the world.  We hypothesize that, for companies, addressing the challenge of building an inclusive company culture across cultural differences could significantly strengthen organizational effectiveness.  Further, ethnic/cultural diversity at the highest levels of company leadership could serve as a signal to employees and other stakeholders that the organization truly understands and values the community and customers that they serve.

*Id*.

50.     And, in May 2020, McKinsey reported that "[t]he business case for inclusion and diversity (I&D) is stronger than ever," finding "that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019," and that, "[f]or diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity."  *Diversity wins* at 3-4.  As McKinsey explained:

> *Diversity Wins* is the third in a McKinsey series investigating the business case for diversity, following *Why Diversity Matters* (2015) and *Delivering through Divers*ity (2018).  This report shows not only that the business case remains robust, but also that the relationship between diversity on executive teams and the likelihood of financial outperformance is now even stronger than before.  These findings are underpinned by our largest data set to date, encompassing 15 countries and more than 1,000 large companies.

*           *           *

- 19 -

In the case of ethnic and cultural diversity, the findings are equally compelling. We found that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019, slightly up from 33 percent in 2017 and 35 percent in 2014. And, as we have previously found, there continues to be a higher likelihood of outperformance difference with ethnicity than with gender.

\*        \*        \*

This growing polarization between high and low performers is reflected in an increased likelihood of a performance penalty. In 2019, fourth-quartile companies for executive-team gender diversity were 19 percent more likely than companies in the other three quartiles to underperform on profitability. This is up from 15 percent in 2017 and nine percent in 2015. And for companies in the fourth quartile of both gender and ethnic diversity the penalty is even steeper in 2019: they are 27 percent more likely to underperform on profitability than all other companies in our data set.

*Id.* (footnote omitted).

51.     These findings demonstrate that firms with greater diversity outperform their peers by a significant margin. Diversity is in the best interests of a corporation and its shareholders. Danaher recognizes this – at least on paper. In practice, however, this appears to be only virtue signaling as Danaher remains one of the few large publicly traded companies in the United States without a single male or female African American director.

## VIII.   MILLIONS IN POTENTIAL EXCESS SHAREHOLDER WEALTH SQUANDERED

### A.      The Danaher Board of Directors

52.     Danaher enjoys the distinction of being one of only a handful of publicly traded companies in the United States without an African American male or female director. The members of the Danaher Board are:

Thomas P. Joyce, Jr.



Linda Hefner Filler



Teri List-Stoll



Walter G. Lohr, Jr.



John T. Schwieters



Elias A. Zerhouni



Mitchell P. Rales



Alan G. Spoon



Jessica L. Mega



Steven M. Rales



Raymond C. Stevens



Pardis C. Sabeti



**B.      Defendants' False and Misleading Statements About Diversity at Danaher**

53.      Publicly, Defendants, in pursuit of the accolades and awards that affirm true diversity leadership, have falsely portrayed Danaher as a leader in diversity and as a company that effectively promotes and achieves diversity at every level of the organization.  Yet Defendants have consistently evaded the opportunity to appoint an African American man or woman to Danaher's Board.

**1.      False and Misleading Statements Concerning Danaher's Commitment to Diversity on the Company's Website and in Its Annual Reports**

54.      Defendants describe on the Company's website the pursuit and accomplishments of what they call the "culture of '*and*.'"  2018 Annual Report, Letter to Shareholders.  It is, according to Defendants, the workforce culture designed to make all employees feel like they belong, and Defendants credit the success of the program to the Company's "leaders who live our Core Values and embody our culture at Danaher."  *Id*.  Similarly, Defendants enthusiastically report on Danaher's efforts and progress toward a diverse, inclusive workplace:

- "*We're passionate about recruiting, developing and retaining the most talented and diverse team possible*."   *Shared Purpose and Core Values*, Danaher Corporation,   https://www.danaher.com/who-we-are/shared-purpose-core-values (last visited Aug. 26, 2020).

- "*Our efforts around diversity and inclusion are among the important drivers of associate engagement, and we have made good progress on these fronts: over the last five years, our associate engagement score is up more than 2,000 basis points*."  2019 Annual Report, Letter to Shareholders.

- "We have made tremendous progress toward this goal [of a better stronger Danaher] and are *honored to be recognized as one of the Top 200 Best Employers for Diversity by Forbes*.  We are committed to improving on these initiatives and metrics over time so that we can continue to build an inclusive and fulfilling *workplace for our associates*."  2018 Annual Report, Letter to Shareholders.

- "Our Associate Resource Groups (ARGs) create opportunities for underrepresented individuals including women and people of color to connect personally and collaborate professionally – all in the spirit of achieving their highest potential. *And we are honored to have been named to Forbes' list of Best Employers for Women (2019) and Best Employers for Diversity (2018 & 2019*)."  2019 Annual Report, Letter to Shareholders.

- "*Reflecting our continued commitment to diversity and inclusion*, we've trained more than 3,000 managers globally on how to build inclusive and diverse teams and leaders . . . ."  2019 Proxy Statement at 13.

55.    Despite multiple awards and recognitions for diversity in Danaher's workplace, Defendants' efforts have conspicuously failed to result in the appointment of any African American men or women to the Board and *zero* African American women to its executive leadership team.[4]

### 2.    False and Misleading Statements Concerning Diversity in the Company's Corporate Social Responsibility Reports

56.    Defendants have caused the Company to publish a corporate sustainability report ("CSR or SR Report") each year.  That report is designed to publicly report on the Company's activities and their impact on the economy, the environment and society at large.  It is also used to

---

[4]    Danaher is headquartered in Washington D.C., which is the home of prestigious universities, government agencies and workplaces.  Washington D.C.'s population is also 47% African American.

promote the Company to its shareholders by describing how its policies are contributing positively

to such concerns.  In these reports, Danaher highlights and repeats much of what is reported on its

website and in its annual reports, focusing on diversity and inclusion, particularly at the senior

executive leadership level.  Specifically, the 2018 SR Report states:

- "***A diverse and inclusive workforce strengthens Danaher and ensures the best team continues to win***.  We are working to support an inclusive culture in which every associate feels they belong.  ***We believe that by building and maintaining a culture rooted in inclusive values*** . . . ."  2018 SR Report at 19.

- "***We seek out a wide range of unique experiences, perspectives and talents, ensuring that diverse voices and viewpoints are heard and celebrated***."  2016-17 CSR Report at 10.

57.     Danaher also reports that it has created five North American Associate Resource

Groups ("ARGs"):  African Descent & Friends, Asian Descent & Friends, Latinx & Friends,

LGBTQ & Friends, Women & Friends.  In 2018, the Company reported on its launch:  "We

strongly believe ***that the best team is a diverse team that reflects the global community we serve***."

2019 SR Report at 4.

58.     Finally, the 2019 SR Report confirms that the Board specifically plays a role in the

Company's overall diversity approach:

> ***Danaher's Board of Directors reviews and provides input on Danaher's D+I strategy annually***.  The Board of Directors also has opportunities, throughout the year, to engage directly in D+I programming.  In 2019, three members of our Board of Directors participated in a roundtable discussion during the Danaher Women's Accelerator Summit.

*Id.* at 28.

59.     Notably, Danaher declined to disclose its diversity representation statistics.  *Id.* at

30.[5]

---

[5]     As of the date of this pleading, Danaher has not yet published its 2020 Sustainability Report.

### 3. False and Misleading Statements Concerning Danaher's Commitment to Diversity in the Company's Proxy Statements

60.     In addition to misrepresentations across the Company's website, the Company's purported commitment to diversity is repeated to shareholders in its Proxy Statements.  The Company's Proxy Statements convey an explicit absence of intention to build a diverse Board, as Defendants make clear that the commitment to the "culture of '*and*'" does not extend beyond (or above) its workforce of associates and, indeed, stops short of its Board of Directors, for which there exists no policy, formal or informal, with respect to the identification, selection or consideration of specific African American nominees.  Instead, the diversity of the Board overall is only a matter of "consideration" when evaluating nominees:

> The Board does not have a formal or informal policy with respect to diversity but believes that the Board, taken as a whole, should embody a diverse set of skills, knowledge, experiences and backgrounds appropriate in light of the Company's needs, and in this regard also subjectively ***takes into consideration the diversity (with respect to race***, gender and national origin) ***of the Board when considering director nominees***.  The Board does not make any particular weighting of diversity or any other characteristic in evaluating nominees and directors.

*See* Danaher Corporation, Proxy Statement (Sch. 14A) (Apr. 1, 2016) ("2016 Proxy Statement") at 23; Danaher Corporation, Proxy Statement (Sch. 14A) (Mar. 31, 2017) ("2017 Proxy Statement) at 5; Danaher Corporation, Proxy Statement (Sch. 14A) (Mar. 28, 2018) ("2018 Proxy Statement") at 5; 2019 Proxy Statement at 5; 2020 Proxy Statement at 5.[6]

---

[6] Danaher has also publicized on its website the progress of its subsidiary, Radiometer, in promoting women directors in Denmark.  That progress was indeed compelled by the Denmark Gender Act.  *Radiometer's Gender Diversity in Top Management*, Danaher Corporation, https://www.Danaher.com/news/feature-story/radiometers-gender-diversity-top-management (last visited Aug. 26, 2020):

> ***Over the last four years in Denmark, more directorships and management positions have been filled by women***.  The Danish act on gender equality in management has been a good framework for this development, according to the Confederation of Danish Industry (DI).

> Long before this act was passed in Denmark, Radiometer, who manufactures measuring instruments to the health care sector, has made a conscious effort to get an equal representation of men and women in their top management positions.

61.    Despite the stated absence of intention to create an ethnically diverse Board that includes African Americans, the Board actively considers Board Refreshment during that process, stating that as part of that process it will evaluate the "appropriate range of backgrounds" when identifying and evaluating prospective nominees:

*Board Refreshment*

**As part of its process for identifying and evaluating directors and director nominees and ensuring an appropriate range of backgrounds and expertise, our Board actively considers Board refreshment**.  Supported by the Nominating and Governance Committee, the Board seeks to thoughtfully balance the knowledge and experience that comes from longer-term Board service with the fresh ideas, energy and new domain expertise that can come from adding new directors.

2017 Proxy Statement at 5-6.

62.    The "appropriate range of backgrounds," however, has conspicuously excluded African American people from serious consideration and nomination to the Board.  The Proxy Statements were also materially misleading because they failed disclose and acknowledge the impact, as applied, of Danaher's intentional decision not to adopt policies consistent with its stated efforts to produce a diverse and inclusive workforce and exclude those efforts from building diversity on the Board.  Discussion of the impact would have been highly material to Danaher shareholders and their decisions regarding whether to re-elect the Board nominees and vote in favor or against such re-election.  Diversity and inclusion are valued very highly by shareholders

---

"It is no secret that we like diversity," says Henrik Schimmell, President of Radiometer.  "For us diversity is not only about gender, but it is a good place to start.  The more diverse we are, the better we function as a team."

Radiometer is a good example of the development moving in the right direction when it comes to distributing Danish management positions more evenly between genders.  More women are becoming part of the board and management teams of Danish companies, a new analysis from DI shows.  Schimmell thinks that the act with the objective to make more women join Danish boards is a good tool, and that it sends a good signal.

and purportedly by Defendants.  The false Proxy Statements therefore harmed the Company by interfering with the mechanism for informing shareholders and electing directors to the Danaher Board.

### 4. The Statements About Danaher's Racial and Ethnic Diversity Were Knowingly False

63.     Danaher is not a leader in diversity and inclusion.  In 2020, Danaher still does not have a single African American on its Board.  The Company's senior executive ranks include one African American man and *zero* African American women.

64.     Moreover, the representation in the 2016 and 2020 Proxy Statements that Danaher believes it is important to consider diversity in gender, race and national origin is misleading because a reasonable reading of the Proxy Statements conveys that the Company is actively seeking to achieve diversity on its Board.  But the fact remains that Danaher has no African American Board members, and no African American has served on Danaher's Board since at least 2015.  The undisclosed truth is, therefore, that while Danaher may maintain a policy that states it is attempting to bring racially diverse candidates into its director nominee pool, it either has no intention of actually nominating such persons to its Board or is engaged in efforts to thwart the nomination of such persons and prefers applicants other than African Americans in the pool.

### C. The Nominating and Governance Committee's Role in the Perpetuation of Danaher's Non-Racially Diverse Board

65.     The Charter of the Nominating and Governance Committee states that the Committee is responsible for developing and leading the process for identifying individuals qualified to become Board members, making recommendations to the Board regarding all nominees for Board membership, and reviewing and considering candidates for election as directors submitted by shareholders.  *See* 2019 Proxy Statement at 5.  At all relevant times, defendants Filler, Lohr, Schwieters, and Zerhouni served on the Nominating and Governance

Committee of the Danaher Board.  But rather than uphold Danaher's commitment to develop diverse leaders at "all levels" of the Company and in the selection criteria for new board members, Filler, Lohr, Schwieters, and Zerhouni chose instead to perpetuate Danaher's exclusion of African American directors under the pretext that the existing members constitute a "diverse" board. Danaher has no policy in place requiring the consideration of African American men or women for appointment to its Board, but instead claims to merely "take[] into consideration" race and gender "in light of the Company's needs." *See id.*  Consequently, many qualified African American candidates who would have allowed Danaher and its shareholders to benefit from the perspectives of an African American on the Danaher Board have been excluded from consideration.

66.     Further, Defendants' statements in the Proxy Statements, coupled with the Company's often cited programs designed to build a diverse workplace, suggest to the public and Danaher shareholders that Danaher actively promotes "diversity and inclusion" and the development of diverse leaders at "***all levels*** of our organization."  2019 Annual Report at 8; 2016-17 CSR Report at 10.  But, in fact, Defendants have made no real effort to promote racial diversity on the Board.  In 2020, Danaher has earned the ignominious distinction of being one of the remaining large publicly traded companies without a single African American director.

**D.     Danaher's Majority Voting Rule, as Applied, Discourages the Nomination of Ethnic Minorities and African Americans to the Board**

67.     Danaher's 2019 and 2020 Proxy Statements state that the Company's bylaws and corporate governance policies provide for a majority voting standard in uncontested elections of directors.  Therefore, "[i]n uncontested elections, our directors must be elected by a majority of the votes cast, and an incumbent director who fails to receive such a majority automatically tenders his or her resignation."  2019 Proxy Statement at 7; 2020 Proxy Statement at 7.  But Danaher's facially neutral majority voting rule, as applied by Defendants, operates to entrench current directors in office and thus prevents the necessary "refreshment" that would allow African

Americans to receive an opportunity to be fairly considered for nomination and appointment to the Danaher Board.  As a result, the application of the Company's corporate governance policies by Defendants has enabled them to prevent ethnic diversity on the Board.

68.     Moreover, each of the Proxy Statements was materially misleading because each failed to disclose that the effect of the majority voting rule, as applied by Defendants, inhibited the fair and honest consideration of an African American person for appointment/election to the Danaher Board.  These omissions were material to shareholders' decisions regarding whether to re-elect the incumbent directors at the annual meeting.  The misleading Proxy Statements harmed the Company by interfering with the mechanisms for the election of directors by shareholders.  As a result of the false or misleading statements in the Proxy Statements, Danaher shareholders voted to elect or re-elect Defendants to the Board.

### E.    The Absence of Term Limits Discourages the Nomination of African American Men or Women to the Board

69.     Danaher's Corporate Governance Charter states that the Company does not have term limits for directors.  But the unstated purpose and impact of the lack of term limits at Danaher is to entrench current directors in office, which effectively prevents African American men and women from fair and honest consideration, let alone appointment, to the Danaher Board.  To attempt to justify this position, Defendants have effectively resisted efforts to appoint new members to the Board by claiming that individuals who have served on the Danaher Board for, in some cases, over a decade, including defendants Filler, Lohr (35 years), M. Rales (35 years), S. Rales (35 years), Schwieters (15 years), Spoon (19 years) and Zerhouni (11 years), have experience and perspective to continue to guide the Company.  *See* 2019 Proxy Statement at iv.

70.     In truth, however, longer tenured directors do not serve the best interests of the corporation, as demonstrated by leading academics and professionals in the field of best corporate governance principles.  *See, e.g.*, Jon Lukomnik, *Board Refreshment Trends at S&P 1500 Forums*,

Harvard   Law   School   Forum   on   Corporate   Governance   (Feb.   9,   2017),

https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms.

71.     Defendants' failure to adopt director term limits or nominate African American men

or women to the Board portrays an improper and far-too-long-unchallenged pretext for effectively

denying Danaher shareholders the benefit of a fair and honest opportunity to be seriously

considered for a seat on the Danaher Board.  This has harmed Danaher and its shareholders by

allowing Defendants to perpetuate a lack of racial diversity on the Danaher Board (and on

Danaher's senior executive leadership team).

72.     Moreover, the Proxy Statements were false and misleading because they did not

disclose the effect, as applied, of Danaher's lack of term limits.  These omitted facts, had they been

disclosed, would have been highly material to Danaher shareholders' decisions regarding whether

to re-elect the Board nominees and vote in favor or against the "say on pay" executive

compensation proposals.  Diversity and inclusion are valued very highly by shareholders.  The

false Proxy Statements harmed the Company by interfering with the mechanism for electing

directors to the Danaher Board.  As a result of the false or misleading statements in the Proxy

Statements, Danaher shareholders voted to re-elect Defendants to the Board each year.

**F.     Defendants Have Enriched Themselves at the Expense of Danaher's
Shareholders by Making Misleading Statements About Danaher's
Commitment to Diversity**

73.     At all relevant times, directors Filler, Lohr, Schwieters and Zerhouni served on the

Nominating and Corporate Governance Committee of the Danaher Board.  But rather than uphold

Danaher's "continued commitment to diversity and inclusion," the selection criteria for new Board

members merely "takes [diversity] into consideration" in selecting nominees and, as evidenced by

the Board make-up and nominations, perpetuates the continuing absence of African American

directors under the pretext that the existing members constitute a diverse board.  *See* 2019 Proxy

Statement at 5, 13; 2020 Proxy Statement at 5.  Consequently, many qualified African American potential candidates/nominees who would have allowed Danaher and its shareholders to benefit from the perspectives of an African American on the Danaher Board have been overlooked and thus excluded from consideration.  The following chart sets forth the compensation earned by Danaher directors in 2019:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards | Total ($) |
|---|---|---|---|---|
| | | | | |
| Linda Heffner Filler | $0 | $245,120 | $89,958 | $335,078 |
| Thomas P. Joyce | $1,300,000 | $6,842,328 | $5,476,607 | $13,618,935 |
| Teri List-Stoll | 0 | $209,120 | $89,958 | $299,078 |
| Walter G. Lohr | $138,000 | $89,120 | $89,958 | $317,078 |
| Mitchell P. Rales | - | - | - | - |
| Steven M. Rales | - | - | - | - |
| Alan G. Spoon | $0 | $209,120 | $89,958 | $299,078 |
| Raymond     C. Stevens | $0 | $209, 120 | $89,958 | $299,078 |
| Elias A. Zerhouni | $0 | $245,120 | $89,958 | $335,078 |
| Jessica L. Mega | $15,781 | $46, 553 | $42,672 | $105,006 |
| Pardis C. Sabeti | $0 | $62,334 | $42,672 | $105,006 |

2020 Proxy Statement at 16, 40 (footnotes omitted).

## IX.   MINORITY MAJORITY DEMOGRAPHIC SHIFTS AND EMERGING TECHNOLOGIES URGENTLY CALL FOR AFRICAN AMERICANS ON CORPORATE BOARDS OF DIRECTORS

74.    The United States is in the midst of a well-documented minority-majority changeover.  At the same time, the more widespread availability of new technologies, like algorithms, linked with Artificial Intelligence ("AI") and Big Data, is creating the potential for their use as 21st century tools of racism.  These shifts in American culture and commerce and their attendant challenges – and potential perils – reinforce the urgency for African Americans on corporate boards of directors.

75.    As Axios reported on April 29, 2019, "[b]y 2045, the U.S. as a whole is projected to become majority minority.  And the changes are already underway:  non-white Americans are now the majority of the population in four states, as well as in the most prosperous and powerful

U.S. cities."   Stef W. Kight, *America's minority majority future*, Axios (Apr. 19, 2019), https://www.axios.com/when-american-minorities-become-the-majority-d8b3ee00-e4f3-4993-8481-93a290fdb057.html.  For companies unable to adapt, this shift is potentially an existential threat:

> In recent years, the corporate world has had endless conversations about the importance of diversity, first positioning it as a moral imperative and then making the business case.  Many companies and executives have repeatedly pledged their commitment to diversity and inclusion efforts, often with little to show for it.  Soon they'll have no choice but to act.
>
> \*       \*       \*
>
> All this means that in the coming decades, businesses that have given lip service to promoting diversity will likely have to widen their hiring pipelines, out of sheer necessity.
>
> \*       \*       \*
>
> "If there's an unwillingness to revamp the culture to meet the needs and desires of this changing workforce, then those companies are going to be left behind . . . . Talent is going to shift over to a lot of these smaller, more disruptive, more nimble companies."

Pavithra Mohan, *How the end of the white majority could change office dynamics in 2040*, Fast Company (Jan. 27, 2020), https://www.fastcompany.com/90450018/how-the-end-of-the-white-majority-could-change-office-dynamics-in-2040; *see also* William H. Frey, *The US will become 'minority white' in 2045, Census projects*, Brookings (Mar. 14, 2018), https://www.brookings.edu/blog/the-avenue/2018/03/14/the-us-will-become-minority-white-in-2045-census-projects/.

76.     And diverse directors are no more urgently needed than in the technology sector, including biotechnology and life sciences, where African Americans remain significantly underrepresented.  With the growing acknowledgment that new facially neutral technologies, like AI and Big Data, can reinforce racial stereotypes and systemic racism against African American

people and ethnic minorities, the urgency for African Americans in director and executive leadership roles is even more acute.

77. Experts agree that diversity can create an effective defense against these tools of progress becoming instruments that execute the levers of institutional racism. A recent June 18, 2020 report to the United Nations Human Rights Council on emerging digital technologies and discrimination found that "[e]merging digital technologies driven by big data and artificial intelligence are entrenching racial inequality, discrimination and intolerance, a UN human rights expert said today, calling for justice and reparations for affected individuals and communities." *Emerging digital technologies entrench racial inequality, UN expert warns*, United Nations Human Rights, Office of the High Commissioner (July 15, 2020), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=26101&LangID=E.

78. Specifically, the report authored by E. Tendayi Achiume, a United Nations Special Rapporteur on racism and independent United Nations human rights expert, concluded that "[t]echnology produced in such fields that disproportionately exclude women, racial, ethnic and other minorities is likely to reproduce these inequalities when it is deployed," and that "[p]roducing technology that works within complex social realities and existing systems requires understanding social, legal and ethical contexts, which can only be done by incorporating diverse and representative perspectives as well as disciplinary expertise."

> Emerging digital technology sectors, such as those in Silicon Valley, are characterized by a "diversity crisis" along gender and race lines, especially at the highest levels of decision-making. According to an important study of the field, "currently, large scale AI systems are developed almost exclusively in a handful of technology companies and a small set of elite university laboratories, spaces that in the West tend to be extremely white, affluent, technically oriented, and male. These are also spaces that have a history of problems of discrimination, exclusion, and sexual harassment." The study further finds that "this is much more than an issue of one or two bad actors: it points to a systematic relationship between patterns of exclusion within the field of AI and the industry driving its production on the one

hand, and the biases that manifest in the logics and application of AI technologies on the other."

E. Tendayi Achiume, *Racial discrimination and emerging digital technologies: a human rights analysis*, Human Rights Council, ¶17 (June 18, 2020), https://www.ohchr.org/EN/HRBodies /HRC/RegularSessions/Session44/Documents/A_HRC_44_57_AdvanceEditedVersion.docx (footnotes omitted).  In an April 2019 report, New York University's AI Now Institute echoed strikingly similar concerns, stating:

> Systems that use physical appearance as a proxy for character or interior states are deeply suspect, including AI tools that claim to detect sexuality from headshots, predict "criminality" based on facial features, or assess worker competence via "micro-expressions."  Such systems are replicating patterns of racial and gender bias in ways that can deepen and justify historical inequality.  The commercial deployment of these tools is cause for deep concern.

Sarah Meyers West, Meredith Whittaker & Kate Crawford, *Discriminating Systems: Gender, Race, and Power in AI*, AI Now Institute, at 3 (Apr. 2019), https://www.ainowinstitute.org/ discriminatingsystems.pdf (footnotes omitted).

79.    Outside the academy, examples of technologies utilizing algorithms linked with AI that promote increased risks of racism abound.  For example, on October 2019, *The Washington Post* reported on a "[a] widely used algorithm that predicts which patients will benefit from extra medical care dramatically underestimates the health needs of the sickest black patients, amplifying long-standing racial disparities in medicine."

> The problem was caught in an algorithm sold by a leading health services company, called Optum, to guide care decision-making for millions of people. . . .

> Correcting the bias would more than double the number of black patients flagged as at risk of complicated medical needs within the health system the researchers studied, and they are already working with Optum on a fix.  When the company replicated the analysis on a national data set of 3.7 million patients, they found that black patients who were ranked by the algorithm as equally as in need of extra care as white patients were much sicker: They collectively suffered from 48,772 additional chronic diseases.

*    *    *

Machines increasingly make decisions that affect human life, and big organizations – particularly in health care – are trying to leverage massive data sets to improve how they operate.  They utilize data that may not appear to be racist or biased but may have been heavily influenced by longstanding social, cultural and institutional biases – such as health-care costs.  As computer systems determine which job candidates should be interviewed, who should receive a loan or how to triage sick people, the proprietary algorithms that power them run the risk of automating racism or other human biases.

*      *      *

"I am struck by how many people still think that racism always has to be intentional and fueled by malice.  They don't want to admit the racist effects of technology unless they can pinpoint the bigoted boogeyman behind the screen . . . ."

Carolyn Y. Johnson, *Racial bias in a medical algorithm favors white patients over sicker black patients*, Wash. Post (Oct. 24, 2019), https://www.washingtonpost.com/health/2019/10/24/racial-bias-medical-algorithm-favors-white-patients-over-sicker-black-patients/.

80.     "The problem with algorithms is that they are 'inherently racist' . . . ."  Samara Lynn, *Artificial Intelligence and Algorithms: 21st Century Tools for Racism*, Black Enterprise (Apr. 30, 2019), https://www.blackenterprise.com/racism-of-artificial-intelligence-and-algorithms/. "'Algorithmic decision-making is based on historical data . . . .  A system will look at, for example, how many people were evicted in Bed-Stuy [a Brooklyn neighborhood] over the last 10 years. When you are going for an apartment and then when your landlord does a credit check, if you're black and it says there were historically huge amounts of evictions [among the black community], then you may not get the apartment.'"  *Id.*

81.     These previously, perhaps, unidentified risks associated with AI and automation can readily translate into enterprise risks for corporations and their boards of directors and leadership teams.  In April 2019, for example, the U.S. Housing and Urban Development ("HUD") agency sued Facebook for housing discrimination because its ad-targeting technology allegedly allowed property owners to target their properties to Facebook users based on race and other

factors.  Kaya Yurieff, *HUD charges Facebook with housing discrimination in ads*, CNN Business (Mar. 28, 2019), https://www.cnn.com/2019/03/28/tech/facebook-hud-ad-discrimination/index.html.  As HUD Secretary Ben Carson stated: "'Facebook is discriminating against people based upon who they are and where they live . . . .  Using a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face.'"  *Id*.  African American directors can help companies recognize and avoid these and other critical risks around AI and algorithmic decision-making that can result in potentially massive exposure to untoward ills, including, among other things, legal liability, destroyed customer relationships, negative publicity and reputational harm, top-talent flight, and costly workforce turnover.

82.     The demographic shifts and technological advancements currently underway are and will continue to impact America's publicly traded corporations.  If these vital engines of American economic growth cannot adjust, these shifts may become existential threats to their abilities to continue as going concerns.  Racially and ethnically diverse directors and executives reflect these changes, and their diverse backgrounds, experiences, perspectives, and skills can help corporate boards of directors successfully navigate the minority-majority changeover and the threat posed by AI and similar technologies becoming 21st century tools of racism and oppression.  Despite the multi-fold benefits to the Company and its shareholders, Defendants have instead chosen to exclude African Americans from the Danaher Board.  By doing so, they are breaching their fiduciary duty to act in the best interests of Danaher and its shareholders.

## X.     DERIVATIVE ALLEGATIONS

83.     Plaintiff incorporates ¶¶1-82.

84.     Plaintiff brings this action for the benefit of Danaher to redress injuries suffered, and to be suffered, by Danaher due to defendants' breaches of fiduciary duty and violations of law.  Plaintiff will adequately and fairly represent the interests of Danaher in enforcing and prosecuting

these derivative claims. Danaher is named as a nominal defendant in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise lack.

85. The Danaher Board has 11 members: Defendants Filler, Joyce, List-Stoll, Lohr, M. Rales, S. Rales, Schwieters, Spoon, Zerhouni and non-defendant directors Sabeti and Mega. A pre-suit demand on the Danaher Board to commence this action is excused as futile.

86. Defendants' unwillingness to nominate any African American men or women to serve on the Board at Danaher since 2015, despite 56 opportunities to achieve their stated diversity objectives, is antithetical to their fiduciary duty to act in the best interest of the Company and its shareholders. It also belies the truthfulness of Defendants' claim that "[w]e strongly believe that the best team is a diverse team that reflects the global community we serve." 2019 SR Report at 4.

87. The failure to nominate African American directors is not due to a shortage of African American candidates. But rather, it is because Defendants' failure to exert their will is not consistent with the Company's public statements and because of a failure to speak candidly about achieving diversity at Danaher. African Americans are proven leaders in every segment of the armed forces and the academy, business and industry, entertainment and sports, healthcare and science, religion, and innovation and technology. Yet today, in 2020, there are no African Americans on Danaher's Board, despite Defendants' public proclamations about building diverse leaders at all levels of the Company. The combination of these factors amounts to a breach of their fiduciary duty to act in the best interests of the Company and its shareholders. Research confirms that more diverse firms outperform their less diverse counterparts. Hence, the absence of a single African American on the Danaher Board has impaired, and continues to impair, corporate wealth at Danaher. In this case, Defendants' apparent hostility to the nomination of African American

director candidates is sufficient reason to doubt that Defendants could fairly and objectively consider a pre-suit demand.

88.     More specifically, at Danaher, the members of the Board serve for a period of one year at a time.  Thus, in every year, up to 11 board seats become available to be potentially filled with an African American director candidate.   Over a five-year period, Defendants had approximately 56 unique opportunities to nominate an African American director candidate to Danaher's Board.  But every time they chose not to do so.  Today, in 2020, zero African Americans serve on the Danaher Board, and *zero* African Americans have even been nominated to Danaher Board since at least 2015.  Yet, during this same time period, the Company's Proxy Statements, corporate sustainability reports and website postings reveal that Defendants made, or were causing Danaher to make, public statements affirming Defendants' commitment to diversity and holding Danaher out as a company that actively promotes and achieves measurable diversity objectives.

89.     A director must speak the entire truth whenever he or she undertakes to say anything on behalf of the corporation.   A director likewise must act consistent with the corporation's stated initiatives, policies and programs designed to promote diversity and inclusion. Here, the overall false and misleading nature of Defendants' statements that Danaher values diversity at all levels and portraying Danaher as a company that promotes and achieves measurable diversity objectives are belied by the irrefutable fact that, today, in 2020, there are *zero* African Americans on Danaher's Board, and none have even been nominated, much less served, on Danaher's Board since at least 2015.  With respect to falsity, these dismal results speak for themselves in light of Defendants' very public statements in support of achieving diversity at the very top of Danaher.

90.     Absent Danaher's widely disseminated stated diversity objectives, Defendants' failure to nominate or seat an African American director on the Danaher Board would still be

unacceptable.  But that is not the situation here.  Far from remaining silent on the topic of diversity and inclusion, Defendants publicly affirmed Danaher's commitment to diversity and publicly positioned the Company as a leader in diversity to gain competitive and commercial advantage. Danaher's shareholder reports and sustainability reports echo the same thing:  Danaher affirms, supports and is achieving racial diversity at all levels of the organization.

91.     But Defendants have not actually sought the racial or ethnic diversity in the boardroom that would have been in alignment with their public representations.  Over the course of the last five years there have been up to 56 unique opportunities for the longest serving director defendant to select an African American director candidate for the Danaher Board.  Yet, as of today, there are still no African American directors at Danaher.  Thus, despite their public representations supporting diversity at the top, Defendants have either failed to include African Americans from the pool of candidates for nomination to Danaher's Board or, alternatively, but equally damning, Defendants have rejected every African American director candidate that was in the pool or was considered over the last five years.  Whether the former or the latter, the fact is Defendants have breached their fiduciary duty of loyalty to Danaher and its shareholders.

92.     Danaher is headquartered to one of the most economically vibrant and ethnically diverse locations in the world – Washington, D.C.  Danaher is also located in close proximity to some of the world's most prestigious academic and scientific institutions, including Georgetown University, American University, Howard University, George Washington University, and Johns Hopkins University, whose alumni and faculty have become leaders in medicine, education, and government.  They are top executives of Fortune 500 companies, leaders of major law and lobbying firms, and even a 2020 candidate for the Vice Presidency of the United States of America. Their alumni and faculty are African American men and women too.  Hence, Defendants' failure to nominate an African American to the Danaher Board, despite their access to an extraordinarily

talented pool of potential director candidates, exposes the falsity of their stated intention to promote diversity at the top of Danaher, rendering their public statements affirming the value of diversity materially false and misleading when made. Indeed, other large multinational corporations, including key Danaher competitors Corning and Thermo Fisher Scientific, have managed to nominate and appoint African Americans to their boards of directors. *See Corning Board of Directors*; *Thermo Fisher Board of Directors.*

93.     These companies presently enjoy the benefits of the demographic and cognitive diversity that African American directors bring to boards of directors. But not Danaher. There are still *zero* African American men or women on the Board, despite numerous opportunities for Defendants to achieve this goal.

94.     The case for racial and ethnic diversity in the boardroom is now overwhelming. In 2018, McKinsey found "that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits." *Delivering through Diversity* at 13. As a result, Defendants have failed to act in the best interests of the Company and its shareholders by shunning African American director candidates. The Company and its shareholders have been injured because they have been wrongfully denied the benefits of the diversity of background, experience and perspectives that African American directors would have provided.

95.     Consequently, as detailed in the facts alleged above, Defendants each face a substantial likelihood of liability for breach of fiduciary duty and violations of the federal proxy laws. Where, as here, a majority of the directors face a substantial likelihood of liability based on the face of the complaint, with the particularized facts alleged taken as true, a pre-suit demand is excused as futile.

96.     The business judgment rule is not a litigation bar that shields Defendants from substantial liability for false statements about their commitment to diversity and the absence of

African Americans on Danaher's Board.  And its application in this case could accentuate the harm already done by Defendants' false statements.  In this time of reckoning, even the oldest assumptions, doctrines, and premises should be revisited.  The business judgment rule, a doctrine providing judicial deference to the decisions of corporate directors, a cohort whose numbers historically, and today, remain underrepresented by people of color, is no exception.  It is a form of privilege historically enjoyed only by mostly all-white boards of directors affirming corporate directors' power and prestige in society for over a century.  Today, in 2020, the business judgment rule should fall far short of immunizing directors for actions that deny racial and ethnic minorities from the full opportunity for consideration, nomination and membership on boards of directors. Especially where, as here, the Defendants publicly represented Danaher as building diverse leaders throughout its organization and as a Company that achieves measurable diversity objectives.  But, in fact, for at least five years, no African American has been nominated, let alone seated, on the Danaher Board under the director selection criteria as applied by Defendants (and, in some cases, their predecessors).

97.     Today, in 2020, leaders in the judiciary systems are in the process of examining their historical practices, policies and procedures for unconscious bias that may unfairly discriminate against racial minorities or support historical systems of racism.  *See, e.g*., Mike Scarcella, "*Our Moral Imperative": Washington State Justices Issue Open Letter Confronting Racial Injustice*, Nat. L. J. (June 5, 2020), https://www.law.com/nationallawjournal/ 2020/06/05/our-moral-imperative-washington-state-justices-issue-open-letter-confronting-racial-injustice/.

98.     Commentators and experts on diversity and inclusion agree.  "Proclamations about racial inequality and injustice are only the beginning.  This must be followed by consistent efforts and actions that are measurable and demonstrable.  Corporations that advocate for equality and

justice should at the very least have a boardroom that demonstrates this." Patricia Lenkov, *Beyond Commitment: Improving Black Leadership In Corporate America*, Forbes (June 7, 2020), https://www.forbes.com/sites/patricialenkov/2020/06/07/beyond-commitment-improving-black-leadership-in-corporate-america/#4dd729ec257d.

99.     In sum, Defendants' dereliction of their fiduciary duties to speak honestly about Danaher's commitment to diversity and maximize corporate value is not in the best interests of the Company and its shareholders.  Given the gravity of the claims, there is ample reason to doubt that Defendants can adequately detach themselves from not just the facts alleged, but also from the financial, social and reputational dynamics at play, to fairly consider a pre-suit demand.  Without full confidence in Defendants' ability, individually and collectively, to evaluate a pre-suit demand with disinterest, impartiality and objectivity, and without concern for any personal considerations, financial or otherwise, a pre-suit demand on the Danaher Board to commence this action is excused as futile.

100.     Plaintiff has not made any demand on Danaher shareholders to institute this action since such demand would be a futile and useless act for the several reasons.  First, Danaher is a publicly traded company with more than 693 million shares outstanding as of February 6, 2020, held by hundreds or thousands of individuals and entities spread throughout the country.  Second, making demand on such a number of shareholders spread throughout the country would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders.  Third, making demand on all shareholders would force plaintiff to incur significant expenses, assuming all shareholders could be individually identified.

## XI.     COUNT I

**Against All Defendants for Breach of Fiduciary Duty**

101.     Plaintiff incorporates ¶¶1-100.

102.    Defendants owed and owe Danaher fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Danaher the highest obligation of loyalty, good faith, due care, oversight, and candor.

103.    Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

104.    Specifically, each of Defendants, in breach of their fiduciary duties of care, loyalty and good faith, intentionally or recklessly caused the Company to disseminate to Danaher shareholders materially misleading and inaccurate information through, among other things, the SEC filings and other public statements and disclosures detailed herein.  Defendants had actual knowledge of their misrepresentations and omissions of material fact or acted with reckless disregard for the truth in failing to ascertain and disclose such facts, even though such facts were available to them.

105.    As a direct and proximate result of Defendants' conscious failure to perform their fiduciary obligations, Danaher has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.  Defendants breached their fiduciary duties owed to Danaher and its shareholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties to act in the best interests of Danaher and its shareholders to maximize corporate value.

## XII.    COUNT II

**Against All Defendants for Unjust Enrichment**

106.    Plaintiff incorporates ¶¶1-100.

107.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Danaher.  Defendants were unjustly enriched by their receipt of compensation while breaching their fiduciary duties owed to Danaher.

108.    Plaintiff, as a representative of the Company, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## XIII.   COUNT III

**Against All Defendants for Violation of §14(a)**
**of the Exchange Act and SEC Rule 14a-9**

109.    Plaintiff incorporates ¶¶1-100, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegations of, or reference to any allegations of fraud, scienter, or recklessness with regard to this claim.

110.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9(a).

111.    The 2016, 2017, 2018, 2019 and 2020 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Danaher to exclude African American candidates from the pool of candidates for nomination to the Danaher Board and/or the senior executive leadership team, and that Defendants were not committed to true diversity throughout Danaher's ranks, including in the boardroom – facts that Defendants were aware of and participated in as set forth herein.

112.    In the exercise of reasonable care, Defendants should have known that the 2016, 2017, 2018, 2019 and 2020 Proxy Statements were materially false and misleading when issued.

113.    The misrepresentations and omissions in the 2016, 2017, 2018, 2019 and 2020 Proxy Statements were material to plaintiff and would be material to reasonable investors who voted on each Proxy Statement.  The 2016, 2017, 2018, 2019 and 2020 Proxy Statements were an essential link in Danaher shareholders following the Company's recommendation to re-elect Defendants to the Danaher Board and approve the executive pay packages, as revelations of the truth would have immediately thwarted a continuation of the Danaher shareholders' endorsement of the directors' positions and the executive officers' compensation.

114.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

(a)    Awarding money damages against all Defendants, jointly and severally, for all damages, injuries, and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that Defendants do not participate therein or benefit thereby;

(b)    Directing all Defendants to account for all damages caused by them and all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, and insider sales proceeds, and imposing a constructive trust thereon;

(c)    Directing Danaher to take all necessary actions to remove the institutional structures preventing the Company from achieving its stated diversity objectives, including, but not limited to, adopting, implementing and maintaining the following initiatives, policies and procedures designed to promote greater racial diversity, equity and inclusion:

(i)      Nominate three new persons to serve on the Danaher Board, which candidates shall include two African Americans and one other racial minority to replace three current Danaher directors.

(ii)      Invest $150 million in economic and social justice programs for the African American community designed to address historical racial disparities.

(iii)      Fill 15% of all new positions in the United States with African Americans.

(iv)      Finance 100 education scholarships valued at $100,000 each for K-12 African American students annually at partner schools located in the communities in which the Company does business and/or maintains its headquarters.

(v)      Invest in the Company's talent pipeline by creating and/or expanding connections with Historically Black Colleges and Universities located in the United States.

(vi)      Give diversity, equity and inclusion sustained C-suite support by shifting from preventative measures, such as anti-bias training, to proactive ones, such as increasing the number of African American candidates considered for open positions and rewarding the people who contribute to the Company's success.

(vii)      Develop a program to ensure fair and equitable hiring across the Company – to remove hiring bias, increase representation of African Americans within senior leadership, management and supervisory ranks, and create more accountability and oversight for the advancement of diversity and inclusion practices and systems within the Company.

(viii)      Provide managers the skills they need to support diversity, equity and inclusion efforts.

(ix)      Create a public facing dashboard reporting the Company's progress, which shall include, among other things:

1)      the representation of African American women in the United States at the vice president and above level;

2)      the representation of African Americans in the United States at the vice president and above level;

- 45 -

3)      the representation of African American men and women on the Danaher Board;

4)      the percentage of Danaher's workforce actively engaged in promoting the Company's diversity, equity and inclusion efforts;

5)      the top business leaders within the Company who have participated in diversity, equity and inclusion training designed to promote inclusive environments and foster ongoing dialogue; and

6)      the names of the African American-owned businesses located in the United States the Company has partnered with during the fiscal year;

(d)      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(e)      Granting such other and further relief as this Court may deem just and proper.

## XV.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 6, 2020               ROBBINS LLP
                                      BRIAN J. ROBBINS
                                      GREGORY E. DEL GAIZO
                                      RICHARD W. KOENEKE (DC Bar No. 411771)


                                      /s/ *Richard W. Koeneke*
                                      _____
                                      RICHARD W. KOENEKE

                                      5040 Shoreham Place
                                      San Diego, CA 92122
                                      Telephone: (619) 525-3990
                                      Facsimile: (619) 525-3991
                                      E-mail: brobbins@robbinsllp.com
                                             gdelgaizo@robbinsllp.com
                                             rkoeneke@robbinsllp.com

                                      Attorneys for Plaintiff

1481324

## **VERIFICATION**

I, Harry Markarian, hereby declare as follows:

I am the plaintiff in this action. I have read the verified shareholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 9/10/2020

DocuSigned by:

4FA695EEB05B484...

HARRY MARKARIAN